AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**7/31/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

UNITED STATES OF AMERICA
Plaintiff,

v.

MARK LORENZO VILLANUEVA,
Defendant

**FILED**
CLERK, U.S. DISTRICT COURT

**07/31/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLD _____ DEPUTY

Case No.    2:25-MJ-04797-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Ronald Steinhoff, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about July 3, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2339B | Attempting to Provide Material Support to a Foreign Terrorist Organization |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Ronald Steinhoff, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    July 31, 2025

_____
*Judge's signature*

City and state:    Los Angeles, California    Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Colin Scott x13159

## <u>AFFIDAVIT</u>

I, Ronald Steinhoff, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant for Mark Lorenzo Villanueva for a violation of 18 U.S.C. § 2339B: Attempting to Provide Material Support to a Foreign Terrorist Organization (the "SUBJECT OFFENSE").  This affidavit is also made in support of an application for a warrant to search the premises located at 3047 Caspian Avenue, Long Beach, California 90810 (the "SUBJECT PREMISES") described in Attachment A, for the items to be seized described in Attachment B.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the SUBJECT OFFENSE.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately one year.  I am currently assigned to the Los Angeles Field Office, responsible for national security matters in Los Angeles.  I have worked in the counterterrorism field for approximately four years both as an FBI Management and Program Analyst and Special Agent.  As a result of my experience in counterterrorism investigations, I am familiar with the strategy, tactics, methods, tradecraft and techniques of foreign terrorist organizations and have participated in investigations that have resulted in the disruption of attacks on the United States of America by international terrorists.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The Islamic State of Iraq and Sham or Syria, also known as ISIS, is a designated Foreign Terrorist Organization. As such, it is a violation of 18 U.S.C. § 2339B to provide ISIS with material support, which includes financial resources.

6.    Mark Lorenzo Villanueva ("VILLANUEVA") communicated with an undercover FBI agent ("UC1") through a social media messaging application ("Social Media Platform 1").  During these communications, VILLANUEVA stated that he knew how to financially support an ISIS fighter, that he had, in fact, previously sent money to an ISIS fighter, and stated he wanted to help UC1 send money to ISIS.

7.    A review of VILLANUEVA's communications on Social Media Platform 1 confirmed VILLANUEVA communicated with a self-

identified ISIS fighter about supporting terrorist activities.
For example, the communications show VILLANUEVA discussed
sending money to the ISIS fighter to cover "weapons," among
other things.  VILLANUEVA also told the ISIS fighter that
VILLANUEVA wanted to fight for ISIS, stating, "It's an honor to
fight and die for our faith.  It's the best way to go to heaven"
and "Someday soon, I'll be joining."  VILLANUEVA has also
communicated with a second self-identified ISIS fighter on
Social Media Platform 1. During this conversation, VILLANUEVA
said he possessed an improvised explosive device ("IED") and
knifes.

8.    VILLANUEVA's Western Union records show that he sent
twelve payments, over the course of a five-month period, to two
ISIS intermediaries who accessed the money in Syria, Turkey, and
Jordan.  In total VILLANUEVA transferred approximately $1,615.
The Western Union transaction records for these transactions
list the SUBJECT PREMISES as the Sender's address.

9.    Based on California Department of Motor Vehicle
records and FBI surveillance, conducted as recently as July 28,
2025, VILLANUEVA lives at the SUBJECT PREMISES.

IV.    <u>BACKGROUND ON ISIS and FOREIGN TERRORIST ORGANIZATIONS</u>

10.    Under 18 U.S.C. § 2339B (Providing or Attempting or
Conspiring to Provide Material Support or Resources to
Designated Foreign Terrorist Organizations), it is a crime to
knowingly provide, or attempt or conspire to provide, material
support or resources to a foreign terrorist organization.  The
term "terrorist organization," as defined in 18 U.S.C.

3

§ 2339B(g)(6), means an organization that is designated as such under section 219 of the Immigration and Nationality Act. In accordance with the Immigration and Nationality Act, the Secretary of State designates certain foreign organizations as Foreign Terrorist Organizations ("FTOs") based on their involvement in terrorist activity or terrorism as defined in as those terms are used in that statute.

11. Material support, pursuant to 18 U.S.C. § 2339A(b)(1), is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe-houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."

12. On or about October 15, 2004, the U.S. Secretary of State ("Secretary") designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AGI as an FTO under Section 319 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.,*

"ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.

13.   On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings:  Islamic State, ISIL, and ISIS.  On March 22, 2018, the Secretary added the following aliases to the FTO and SDGT listings: Amaq News Agency, Al Hayat Media Center, Al-Hayat Media Center, and Al Hayat.  To date, ISIS remains a designated FTO.

## V.   <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **UC1 learns of an ISIS supporter living in California, later identified as VILLANUEVA.**

13.   Based on law enforcement reports, I know that on March 14, 2025, UC1 was messaged by a Social Media Platform 1 user who proclaimed to be an ISIS fighter ("Identified Person 1").[1] Identified Person 1 messaged UC1 and asked if UC1 loved the mujahideen.[2]  Identified Person 1 told UC1 that he was a fighter for the Islamic State and living in Syria.  Identified Person 1 said that he had intended to blow up the Iranian embassy in Lebanon and drove the bombers to the location.  Identified Person 1 said he was sentenced to life in prison for his involvement in that scheme but had only served ten years because

---

[1] The name of this individual is known to your affiant.

[2] Based on my training and experience, mujahideen is a term referring to those who engage in jihad.  I understand jihad to be a holy war against the enemies of Islam.

when the Syrian regime fell, they "freed the brothers."[3]

Identified Person 1, when discussing his adherence to Islam,

stated, "we are man of war and sons of hatred."  Within the

context of the messages, and based on my training and

experience, I believe Identified Person 1 is likely referring to

"the brothers" as other ISIS members that may have been released

when the Asaad government lost power in Syria in 2024.

14.  On March 18, 2025, via an account associated with

Identified Person 1 on Social Media Platform 1, Identified

Person 1 messaged the UC1 about a contact in California writing:

> If you wish, my brother, there is a brother I know
> well from the state of California. He is also from
> America and he is telling you about me and
> recommending me to you.  God is a witness between us,
> and God knows best.

15.  When again talking about the "brother in California,"

Identified Person 1 stated to UC1:

> My brother, the brother who is from California, sent
> me $200 so that I could get a passport to immigrate to
> Africa, but he told me that he was going through
> difficult circumstances, and I was embarrassed to ask
> him for more, but I will need to obtain travel
> expenses there. They implement the law of God
> Almighty, or I will stay, but here I need to buy a
> weapon to protect myself with.

16.  On March 18, 2025, Identified Person 1 told the UC1

that he received the money sent by VILLANUEVA from a "brother in

Lebanon" who sends it to him in Syria.  Identified Person 1

---

[3] The messages were originally in Arabic but were translated
by an FBI linguist to English.

said, "it was difficult to send as Brother Lorenz from California did."  When UC1 asked Identified Person 1 if this friend from California was trustworthy, Identified Person 1 responded, "Yes, my brother, he is a very loyal and honest brother."

17.  Identified Person 1 then attached a photo of the Western Union transaction that included the Tracking number (MTCN) of 212-228-4014.

18.  Based on my review of Western Union records, the transaction tied to this tracking number was linked to VILLANUEVA at the SUBJECT PREMISES, namely, the records show the SUBJECT PREMISES as the "Sender Address" for the transaction.

19.  Beginning in March 2025, UC1 and VILLANUEVA began communicating with each other through Social Media Platform 1's messaging application.  Following these initial communications, the FBI obtained subscriber records for the Social Media Platform 1 account associated with VILLANUEVA.  These records show that VILLANUEVA's Social Media Platform 1 account was created using ozzczz@yahoo.com as the email address.  Yahoo records show that the recovery email for the ozzczz@yahoo.com email address is Shadowkiller013@gmail.com, and the recovery phone number is a number ending in -2686.  This recovery phone number matches an identified phone number associated with

VILLANUEVA and registered to the SUBJECT PREMISES through records provided by T-Mobile.

20.  A review of Social Media Platform 1 records obtained pursuant to a federal search warrant show that beginning in or about February 2025, VILLANUEVA began communicating with Identified Person 1 about supporting ISIS.

**B.    VILLANUEVA Knowingly Provided Money to ISIS**

21.  Based on my review of Social Media Platform 1 records, I learned the following information.

1.    VILLANUEVA Sends Money to Identified Person 1 an ISIS Fighter

22.  On February 10, 2025, VILLANUEVA and Identified Person 1 communicated via Social Media Platform 1's messenger application.  The messages were originally in Arabic but were translated by an FBI linguist to English.  I have reviewed the translations of those messages.

23.  Identified Person 1 told VILLANUEVA that he was a prisoner of the Assad regime in Syria and was imprisoned for 10 years.  Identified Person 1 asked VILLANUEVA for money to travel to Iraq to "sign up two infidels[.]'"

24.  VILLANUEVA and Identified Person 1 exchanged the following messages:

> VILLANUEVA: my dear brother, are you [a] supporter of the Islamic State or were you once a fighter in its side?
>
> Identified Person 1: Yes I was an ISIS fighter I was captured when I was 17 and got released at the age of 30.

> VILLANUEVA: Brother, when are you going to see your
> brother? I can help you with your condition.  If you
> can wait until Friday

25.  On February 10, 2025, VILLANUEVA asked if Identified
Person 1 could use Western Union to receive money.  Identified
Person 1 then stated that he had a brother in Lebanon who could
get the money to then give to him.  Identified Person 1 stated
that his name is, O.K.H.[4]  VILLANUEVA messaged Identified Person
1 stating:

> name: mark Middle name: lorenzo Last name: Villanueva.
> That's my information. So you know more about me. You
> will get the required information you need here.

26.  On February 12, 2025, VILLANUEVA followed up with
Identified Person 1 about the receipt of money.  VILLANUEVA
said:

> Brother, I wand some information about the brother in
> Lebanon, and if it is possible to send him 50 USD
> today so I can make sure the money will get to you by
> Friday.  If everything is ready by Monday, the time
> now is 7:40 in the morning.  I will send the money
> later this afternoon at around 13:00-13:30 in the
> afternoon.

27.  On February 12, 2025, VILLANUEVA asked Identified
Person 1 if the money VILLANUEVA sent would cover Identified
Person 1's weapons.

> VILLANUEVA: No problem, honey.  I've thought about it
> and I'll try and get that for you on Friday.  Shall he
> help us? Brother, does that cover your equipment?  And
> your weapons?  Are you ready or you don't have this?
> I will send a message to the brother now.  I hope that
> the time is suitable for you, if not, I will wait for
> his response all day today.  That would suit me just
> fine.

---

[4] The identify of this person is known to the FBI.

>       Identified Person 1: That would suit me just fine.
>       God bless you!

28.   On February 12, 2025, VILLANUEVA and Identified Person 1 discussed the difficulty of sending money abroad and whether to cancel a message to someone VILLANUEVA had asked about sending money to Identified Person 1.

>       Identified Person 1: I'm afraid he's got to fall into
>       the hands of infidels, because they've got to put him
>       in jail for financing terrorism
>
>       VILLANUEVA: Should have told me this before.  No one
>       should ever suffer at the hands of an unbeliever.
>
>       Identified Person 1: That's fine, brother, remove the
>       message if he did not open it yet [see it].
>
>       Identified Person 1: Send another one [message]
>       without mentioning [Jihad]
>
>       VILLANUEVA: should I cancel sending my message?
>
>       Identified Person 1: Yes

29.   On February 12, 2025, Identified Person 1 sent VILLANUEVA an ISIS propaganda video, which I have reviewed, in which five ISIS solders with guns visible were standing in front of a prisoner who is on his knees with his hands tied behind his back.  The ISIS flag was flying behind them. The video appears to be a preamble for an execution.

30.   Also on February 12, 2025, VILLANUEVA told Identified Person 1 that the money had been transferred and sent a screenshot of the Western Union tracking number.  VILLANUEVA then provided instructions on how to receive the money.  That

day, Identified Person 1 confirmed that he had received the
money.

31.   On February 13, 2025, Identified Person 1 messaged
VILLANUEVA that if Identified Person 1 received the money by
Monday, it would go to his brothers, the "Mujahideen."

32.   On February 13, 2025, VILLANUEVA messaged Identified
Person 1 his willingness to die.  VILLANUEVA stated,

> VILLANUEVA: It's an honor to fight and die for our
> faith.  It's the best way to go to heaven.  Someday
> soon, I'll be joining as well[.]

**C.    Records from Western Union Show VILLANUEVA Sent $1,615
       to Identified Person 1**

33.   On or about July 11, 2025, I reviewed records from
Western Union registered to VILLANUEVA's name, the SUBJECT
PREMISES, and his -2686 Number.  These records show payments
that line up with the timing and amount of money that VILLANUEVA
sent to Identified Person 1, including the tracking number sent
to Identified Person 1 on February 12, 2025, discussed above.

34.   In total, VILLANUEVA sent $1,615 to two individuals
identified as M.H.S. and O.K.H.[5]  The Western Union records show
that ten of the payments were sent to M.H.S. totaling close to
$1,360. Two of the payments were to O.K.H. totaling $255.  The
receiver IP for the payments resolves to locations in Syria,
Lebanon, and Turkey.

35.   Based on my training and experience, I know that ISIS
fighters and those who support ISIS fighters will often use
intermediaries to obfuscate the true recipient of the support

---

[5] The names of these individuals are known to the FBI.

and avoid detection by law enforcement. Identified Person 1's instructions to VILLANUEVA to send funds to M.H.S. and O.K.H. is consistent with this practice.

### D. **VILLANUEVA Communicated with another Self-proclaimed ISIS Fighter**

36.  Based on my review of VILLANUEVA's messages on Social Media Platform 1, I know that in or around January 2024, VILLANUEVA communicated with Identified Person 2.[6]  VILLANUEVA told Identified Person 2 that he lived in America.  Identified Person 2 responded that America was the biggest enemy of Islam.

37.  On February 26, 2024, Identified Person 2 messaged VILLANUEVA in the following exchange:

> Identified Person 2: I finished middle school and joined Jihad.

> VILLANUEVA: Blessing up upon the land of the levant and its people. Amin.

38.  On March 1, 2024, Identified Person 2 sent VILLANUEVA a photo of the ISIS flag.  VILLANUEVA responded with four heart emojis, which based on my training and experience, I know is an expression of support for ISIS.

39.  On March 2, 2024, Identified Person 2 sent VILLANUEVA a photo of a handgun with the message "Personal protection." VILLANUEVA and Identified Person 2 engaged in the following exchange, in which VILLANUEVA said he possessed a wired detonator improvised explosive device ("IED").

> VILLANUEVA: I am able to [operate] pistols and American m4. Praise be to Allah. Allah is the greatest.

---

[6] The name of this individual is known to the FBI.

Identified Person 2: Oh good, but this isn't American, it's Turkish.

VILLANUEVA: I only have knives and wired detonator IED.

Identified Person 2: Ha-ha-ha, good, but beware of intelligence, brother

VILLANUEVA: I have a personal training weapon as im not eligible of attaining weapons.  I had been to jail[7] and was admitted to hospital by my parents.  Brother, I didn't sleep for multiple of days.  Wont be a problem.  Theyre [They are] a basic mechanism.

Identified Person 2: I had a Kalashnikov, a Pixie machine gun, a pistol, a motorcycle, an explosive belt, and a thermal night scope But [but] I have sold them all now and have nothing to do with them.

VILLANUEVA: What is the reason.  Are you not Islamic state?

Identified Person 2: Why did you go to prison?  Yes, an [I am] Islamic state, but now there is no money left to feed my children.  I sold them one by one

40.  On March 2, 2024, VILLANUEVA and Identified Person 2 discussed VILLANUEVA's desire to fight for ISIS:

Identified Person 2: When you come to Saudi Arabia to preform Hajj and Umrah, I will invite you to my home in Syria

VILLANUEVA: The sovereign of mankind, lord of all worlds. All dominion belongs to Allah. Alhamdulillahi maliki yawmedeen. Allah wills for this sich interation within the ummah. By Allah, i [I] will visit your [you] brother. May Allah bless your family and your. Most importantly, may Allah protect you and give you strength always.

---

[7] I am aware that VILLANUEVA was previously convicted of felony criminal stalking in 2015.  Therefore, based upon this conviction, VILLANUEVA would be prohibited from possessing any firearms, explosives, or ammunition.

> Identified Person 2: I will make you shoot and teach
> you how to use weapons. There is security chaos here,
> whoever can carry a weapon
>
> VILLANUEVA: Allah wills for this such interaction
> within the ummah. By Allah, I will visit you brother.
> May Allah bless your family and your. Most
> importantly, may Allah protect you and give you
> strength always.

41. Following the March 2024 conversations, I believe
VILLANUEVA and Identified Person 2 likely began talking over an
encrypted messaging platform based upon their last conversations
which mentioned utilizing an encrypted messaging application for
future conversations.

### D.    **VILLANUEVA Lives at the SUBJECT PREMISES**

42. As set forth in Attachment A, the SUBJECT PREMISES is
located at 3047 Caspian Avenue, Long Beach, California 90810.
Based on records from Los Angeles County, the SUBJECT PREMISES
is a multi-family residence covering approximately 6,150 square
feet.

43. California Department of Motor Vehicle records list
the SUBJECT PREMISES as VILLANUEVA's address.  Additionally, as
discussed above, the recovery phone number for VILLANUEVA's
Social Media Platform 1 account is registered to the SUBJECT
PREMISES.

44. Additionally, based on my review of FBI reports, FBI
agents have conducted surveillance at the SUBJECT PREMISES over
the course of the last two weeks.  During this surveillance, FBI
agents have seen VILLANUEVA exiting and entering the premises
multiple times supporting the conclusion that he lives at the

SUBJECT PREMISES.  FBI agents conducting surveillance know what
VILLANUEVA looks like based on their review of his photo from
the California Department of Motor Vehicle and previous booking
photos provided by the Long Beach Police Department.
Additionally, based upon information developed in this
investigation, VILLANUEVA shares the SUBJECT PREMISES with his
mother, father, sister, brother, and grandparents.

### VI.  TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSE

45.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
material support schemes, I know the following:

46.  It is common practice for individuals involved in
material support schemes to possess and use multiple digital
devices and online accounts at the same time.  Subjects in
material support schemes often use digital devices to perpetrate
their crimes due to the relative anonymity gained by
communicating and conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) planning
material support schemes; (2) communicating about promised,
ongoing, completed, or attempted travel or other support;
(3) payment or other consideration for travel; (4) communicating
about efforts to conceal the scheme; (5) reacting to the success
or failure of the scheme or other acts of terrorism; and
(6) coordinating meetings and other communications with co-
conspirators.  Digital devices used for material support schemes
are often kept on the perpetrator's person or in safe space like

their home.

47.    Based on my training and experience, I know that individuals engaged in material support schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators to conduct their scheme. Oftentimes, they do so on their digital devices and online accounts.  Conspirators often use their digital devices to communicate with co-conspirators by phone, data text, SMS text, email, and social media.

48.    Based on my training and experience, I have learned that key evidence in material support schemes may include messages commonly sent to a subject's personal email accounts. This evidence may include banking information; information about social media accounts used; information about encrypted messaging applications used; information about motive to commit the SUBJECT OFFENSE, like reactions to foreign events; and information about a subject's domestic and international travel. In this case, those communications, screenshots of communications, draft communications, and attachments may be on digital devices inside the SUBJECT PREMISES.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

49.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the electronic evidence is often retrievable from digital devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

51. The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

c. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

d. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

e.    Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VILLANUEVA's thumb and/or finger on the device(s); and (2) hold the device(s) in front of VILLANUEVA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII.    **REQUEST FOR NIGHT SERVICE**

52.  Based on my training and experience, I expect the execution of the arrest warrant and requested premises search warrant to entail unusual safety risks.  There are additional risks in this case due to the potential presence of explosive devices and other weapons.  As described above, VILLANUEVA admitted to possessing an IED and knifes, and has expressed interest in fighting for ISIS.  Explosives, especially homemade ones, present a unique risk to officer safety.

53.  Based on my training and experience, I know that depending on the circumstances, one of the safest and most advantageous time to execute search and arrest warrants is often late at night or very early in the morning due to the fact that targets of the investigation, and any nearby associates, are less likely to arrive at the location at the time of the search. If targets of the investigation were to detect investigators during the search, it could put the investigators and others at risk.  Therefore, investigators request authorization to conduct the premises search at any time day or night.

## IX.  **CONCLUSION**

54.  For all the reasons described above, there is probable cause to believe that VILLANUEVA has committed a violation of 18 U.S.C. § 2339B: Attempting to Provide Material Support to a Foreign Terrorist Organization.

14.  Further, for all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of

violations of the SUBJECT OFFENSE will be found at the SUBJECT

PREMISES, as described in Attachment A.


Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
31st day of July, 2025.

_____
HON. MARIA A. AUDERO
UNITED STATES MAGISTRATE
JUDGE