TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
COLIN S. SCOTT (Cal. Bar No. 318555)
Assistant United States Attorney
National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3159
E-mail: colin.scott@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK LORENZO VILLANUEVA,<br><br>Defendant. | No. 2:25-CR-671-AH<br><br><u>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MARK LORENZO VILLANUEVA</u><br><br>Hearing Date: September 16, 2026<br>Hearing Time: 10:00 a.m. |

Plaintiff United States of America, by and through its counsel of record, the Attorney General, the First Assistant United States Attorney for the Central District of California, and Assistant United States Attorney Colin S. Scott, hereby files its Sentencing Position for defendant Mark Lorenzo Villanueva.

//

//

This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 2, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

/s/
Colin S. Scott
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant sent money to the Islamic State of Iraq and al-Sham ("ISIS") and built an improvised explosive device to carry out an attack motivated by and on behalf of ISIS's murderous ideology. In carrying out these tasks, the defendant communicated frequently with an individual who represented himself to be a fighter for ISIS (the "ISIS Fighter") in Syria and expressed his desire to become a martyr here in the United States. For his conduct, defendant was charged with attempting to provide material support to a foreign terrorist organization, being a felon in possession of a firearm, and manufacturing an unregistered destructive device.

On January 27, 2026, defendant pled guilty to counts one and three of the indictment charging him with attempting to provide material support to a designated foreign terrorist organization and being a felon in possession of a firearm. (Dkt. 25.)

In August of 2026, the United States Probation and Pretrial Services Office ("Probation") filed its Presentence Investigation Report ("PSR"). (Dkt. 33.) Probation calculated defendant's Guidelines range at 360 to 420 months' imprisonment.[1] (Id.) The United States Probation Officer ("USPO") is recommending a total term of 360 months in federal custody, three years of supervised release, and a $200 mandatory special assessment. (Dkt. 32, Rec. Letter, p. 1 and 2.)

[1] Probation explicitly recognizes that the actual guideline range is 360 months to life imprisonment but for the statutory maximum sentence on both counts. (Dkt. No. 33 at 11.)

The government agrees with Probation's guideline findings. The government requests the Court impose a custodial sentence of a total term of 360 months imprisonment, a life-time period of supervised release, and a $200 mandatory special assessment. The defendant presents a significant danger to the community, and a lengthy custodial sentence along with lifetime supervision, is necessary to protect the public.

## II. OFFENSE CONDUCT

### A. Facts Admitted in the Factual Basis

Defendant admitted at his change of plea hearing the following facts:

> Beginning on a date unknown, but by at least February 12, 2025, and continuing through on or about August 1, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MARK LORENZO VILLANUEVA knowingly attempted to provide material support and resources, namely money, services and personnel, to wit, himself, to a foreign terrorist organization, namely the Islamic State of Iraq and al-Sham ("ISIS") knowing that ISIS was a designated foreign terrorist organization that has engaged, and is continuing to engage, in terrorist activity and terrorism.
>
> Specifically, in February of 2025 defendant began communicating over a social media messaging platform with an individual who represented himself to be a fighter for ISIS living in Syria (the "ISIS Fighter"). The ISIS Fighter gave the defendant instructions about how to send him money in Syria. Based on these instructions, VILLANUEVA sent over $1,600 dollars to the ISIS Fighter with the understanding that this money would be spent on ammunition, weapons, and other supplies for ISIS in order for the organization, and the ISIS Fighter specifically, to conduct operations. Additionally, VILLANUEVA discussed conducting operations for the ISIS Fighter in the United States.
>
> In support of his objective to provide support to ISIS, on or before August 1, 2025, defendant manufactured an

explosive and incendiary bomb or similar device (the "improvised explosive device" or "IED") bearing no serial number. Specifically, the IED was comprised of three aerosol-style cans wrapped in aluminum foil that defendant packed with large quantities of ball bearings and other metal objects, including nails, screws, and nuts. Within the outside layer of aluminum foil, defendant placed incendiary material, namely, hundreds of match heads and fireworks, that he attached by wires to a triggering switch. Several of the components of the IED had been manufactured outside the state of California, and prior to August 1, 2025, had been shipped or transported in foreign and/or interstate commerce to California. At all relevant times, defendant knew that the IED was a firearm and destructive device, as defined in Title 26, United States Code, Sections 5845(a)(8) and (f). The destructive device was not registered in the National Firearms Registration and Transfer Record.

At the time of defendant's knowing possession of the IED on August 1, 2025, defendant knew he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, namely, Stalking, in violation of California Penal Code Section 646.9(a), in the Superior Court for the State of California, County of Los Angeles, Case Number TA138766, on or about September 21, 2017.

**B. Defendant's Support for ISIS was Deep Seated**

During the course of this investigation, law enforcement obtained a warrant for defendant's Facebook account. On his account they found evidence of defendant's commitment to ISIS. By at least 2024, defendant was in contact with individuals who he believed were ISIS sympathizers and operatives.

For example, defendant communicated with a Facebook user who called himself "Abu Jaar" ("JAAR"). Defendant told JAAR that he lived in America. JAAR responded that America was the biggest enemy of Islam.

On March 1, 2024, JAAR sent defendant a photo of the ISIS flag to which defendant responded with four heart emojis. The next day,

March 2, 2024, JAAR described having a handgun to which defendant said: "I am able to [operate] pistols and American m4. Praise be to Allah. Allah is the greatest" and "I only have knives and wired detonator IED." This was the first time defendant mentioned having the type of explosive device law enforcement later found at his home.

In October of 2024, defendant received increasingly graphic images of ISIS's operations: including images, one of which is pictured below[2], showing four men in orange jumpsuits having explosives strapped to their necks by a militant with a black face covering.



As 2024 came to a close, defendant's obsession with ISIS deepened and took a troubling turn.

**C. Defendant's Communications with FBI Undercover Reveal Intent to Cause "Mass Damage"**

The defendant also spoke with an undercover FBI agent over

[2] Produced at USAO_00000209.

Facebook messenger. In July of 2025, the defendant expressed his desire to hurt Americans shortly before his arrest in this case. In one exchange, reproduced below, the defendant discussed wanting to cause "mass damage."[3]

FBI UC: "Akhi, do you have weapons ready?"

VILLANUEVA: "I don't have weapons."

VILLANUEVA: "I need proper weapons."

FBI UC: "You want to do something here akhi?"

VILLANUEVA: "I wouldn't do something without instruction and proper weapon. I want to cause mass damage."

FBI UC: "Mashallah akhi, I didn't know you wanted to do that. I thought you wanted to travel instead?"

VILLANUEVA: "I do but if the opportunity of martyrdom is given to me properly. I will have to accept it."

These communications show that the defendant was intent on causing "mass damage" with weapons here in the United States but simply lacked the tools to do so.

**D. Additional Communications with ISIS Fighter in Syria**

After searching the defendant's home in August of 2025, law enforcement uncovered additional communications between the defendant and the ISIS fighter overseas, who was the same individual that defendant admitted to sending over $1,600 dollars through Western Union wire transfers. In these communications with the ISIS Fighter, defendant appeared eager to give up his life for ISIS.

Specifically, on July 24, 2025, defendant and the ISIS Fighter exchanged the following messages[4]:

---

[3] Produced at USAO_00001394.

[4] Produced at USAO_00001471.

> ISIS Fighter: “God willing, I may need you for a matrydom [sic] operation that you can carry out and be relieved of this world and the..."
>
> VILLANUEVA: “maybe that is the only way. We will see my dear. I will only further astray myself in the desolate land of disbelief.”
>
> ISIS FIGHTER: “Life is in God's hands, and we do not know if God has written a long-term plan for you or if your life will end soon.”
>
> VILLANUEVA: “Only God knows when all this will end. Should I seal it with martyrdom?”
>
> ISIS Fighter: “God is generous, you will get it, God willing, if you ask for it sincerely.”
>
> VILLAUEVA: “I would need proper weapons. I want to cause as much damage to the disbelievers.”
>
> ISIS Fighter: “God willing, brother, we will talk later, God willing, but if you see me offline, I might be in the battle or outside the house.”

On July 29, 2025, the following conversation occurred between defendant and the ISIS Fighter:[5]

> ISIS Fighter: “Brother, if you want to send to Melhem now, send it before I go to battle and receive the money.”
>
> VILLANUEVA: “Should I seal it with martyrdom.”
>
> VILLANUEVA: “I want to cause as much damage to the disbelievers.”
>
> VILLANUEVA: “I seen his picture where our Islamic state brother has a lion over his face. He does look like a lion of the desert, I tell you.”
>
> ISIS Fighter: “You, my brother, must. You, brother, must now be a lone wolf. But do not do it before the purchase.”
>
> ISIS Fighter: “Brother, I mean you don’t do any work before you repent.”

[5] Produced at USAO_0000774.

VILLANUEVA: "Indeed brother, everything must be planned first and be noted."

Taken together, these communications, which are only the recovered fragments available from defendant's deleted messages, reveal an individual committed to the violent ideology of ISIS and eager to operationalize his hate.

**E. Defendant's Digital Devices were Replete with ISIS Propaganda**

After the search of defendant's home, law enforcement found a trove of electronic evidence related to his support for ISIS. Defendant saved dozens of propaganda videos and images glorifying ISIS. For instance, one image found on defendant's phone reproduced below, shows the ISIS flag with text in Arabic stating "The caliphate is a matter of time![6]"




In another example, pictured below[7], defendant saved a photo, depicting a fighter with Arabic text stating: "And Allah has preferred the mujahideen over those who sit at home . . ."

---

[6] Produced at USAO_00000737.

[7] Produced at USAO_00000726.




Also on defendant’s phone, law enforcement found a video glorifying ISIS in which militants can be seen parading with firearms.[8]



On his iPad, defendant saved a video,[9] a still of which is pictured below, that shows multiple firearms, two grenades, a knife, the ISIS flag, a Quaran, as well as a book with the title “Jihad” superimposed over Osama bin Laden’s face.

---

[8] Produced at USAO_00000629.

[9] Produced at USAO_00001162.



Law enforcement also found violent images depicting the armed conflict in Syria. For example, a file titled “0000011_Carved” on defendant’s iPhone, appears to show ISIS fighters killing an individual with a car.

Another photo titled “Police Killings.jpg,” also found on defendant’s phone, show two flatbed trucks with mangled bodies inside.

Taken together, these photos and videos show that the defendant was committed to ISIS, collected digital memorabilia glorifying the group, and was undeterred by the brutal violence carried out in its name.

**F. Defendant Built IED for a Terrorist Attack**

After searching the defendant’s home, law enforcement uncovered an IED hidden inside a compartment blocked by luggage and boxes. The device was rendered safe by an FBI Bomb Technician and sent to a laboratory for further analysis. The FBI determined that the IED, pictured below, was packed with shrapnel including nails and ball bearings and only required

two AA batteries to become fully operational.[10] The presence of these items was, in the opinion of the FBI Bomb Technician, consistent with weaponization. This was not a toy made to make noise, but a weapon packed with shrapnel designed to cause "mass damage," and the fact that the device was almost fully operational shows how close defendant was to accomplishing his goal of committing a violent attack.



**G. Post-Arrest Interview Confirms Ideology**

After his arrest the defendant agreed to speak with law enforcement and made the following statements:

- He admitted to producing the IED. Although he didn't know why he had been arrested because he hadn't "planted it yet" and hadn't "done operations with it (Exhibit A at 38);"
- He thought about using the IED on the Fourth of July, not to hurt people, but because of how loud it was (Id. at 41);
- He admitted to sending money via Western Union to the ISIS Fighter who he described as true Islamic State for

[10] Produced at USAO_00000104.

ammunition which he understood would be used to fight the Druze in Southern Syria (Exhibit A at 17-18);[11]

- He said he didn't want his "friend to go into war without no ammunition (Id. at 28);"
- He stated that the ISIS Fighter told him he was a "field commander" for the Islamic State (Id. at 21);
- He stated a desire to go on Haj and then join the Holy War in Syria and engage in Jihad (Id. at 30);
- He knew that ISIS killed innocent people (Id. at 37);
- He said he wanted to pledge allegiance to ISIS but could not because the "leader" was in hiding (Id. at 34);
- The ISIS Fighter had asked him to conduct an operation, which Villanueva understood to mean martyrdom, but Villanueva told the ISIS Fighter he needed better weapons (Id. at 63-64); and
- He said Osama bin Laden was his role model (Id. at 39.)

Even after his arrest, defendant was undeterred in his support of ISIS and other notorious terrorists including Osama bin Laden. These statements show the defendant was devoted to ISIS and was ready to translate that support into action.

## III. GUIDELINES CALCULATIONS

On August 11, 2026, USPO filed the PSR. (Dkt. 33.) USPO's calculations are reflected in the chart below:

| | | |
|---|---|---|
| Base Offense Level | 26 | U.S.S.G. § 2M5.3 |
| Provision of Firearms | +2 | U.S.S.G. § 2M5.3(a) |
| Victim Adjustment (Terrorism Enhancement) | +12 | U.S.S.G. § 3A1.4(a) |

[11] See Who are the Druze and why is Israel attacking Syria?, BBC News (July 16, 2025), https://www.bbc.com/news/articles/c70xyv4z74go

Acceptance of Responsibility -3 U.S.S.G. § 3E1.1(a)

This results in a total adjusted offense level 37.

USPO calculated that defendant is in criminal history category VI. (PSR ¶41.)

A total offense level of 37 and criminal history category of VI yields a Guidelines range of 360 to life. (PSR ¶66.) However in applying U.S.S.G. §5G1.1(a) because the statutory maximum is 240 months for Count 1, the advisory guideline range is the statutory maximum. The term of supervised release range was calculated as not more than life. (PSR at ¶69.) The mandatory special assessments are calculated as a total of $200. (Id. at ¶103.)

USPO recommends this Court impose: (1) a sentence of 360 months; (2) a three-year term of supervised release; (3) a mandatory $200 special assessment; and (4) no additional fines or fees. (Rec. Letter at 1-3.) As outlined in Section V below, the government agrees with the total custodial sentence proposed by USPO but believes that a lifetime period of supervised release is warranted given the facts.

## IV. THE TERRORISM ENHANCEMENT APPLIES

The terrorism enhancement, U.S.S.G. § 3A1.4, increases a defendant's offense level by 12 points and elevates his criminal history to VI "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. Here, U.S.S.G. §3A1.4 applies to the guideline calculations for both Counts 1 and 3, even though Count 3 is not specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B). Here, Villanueva's unlawful possession of a firearm, that being an IED, involved, or was intended to promote,

a federal crime of terrorism, as defined within 18 U.S.C. § 2332b(g)(5). "Federal crime of terrorism" is defined by reference to 18 U.S.C. § 2332b(g)(5) to mean "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of" one of a list of enumerated statutes. See U.S.S.G. § 3A1.4, App. Note 1; 18 U.S.C. § 2332b(g)(5); United States v. Alhaggagi, 978 F.3d 693, 706-07 (9th Cir. 2020). The list of enumerated statutes includes providing material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B, the offense to which defendant pled guilty. See 18 U.S.C. § 2332b(g)(5).

The terrorism enhancement serves the important purpose of "punishing more harshly than other criminals those whose wrongs served an end more terrible than other crimes." United States v. Benkahla, 530 F.3d 300, 313 (4th Cir. 2008); see also United States v. Meskini, 319 F.3d 88 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis is for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.").

The Ninth Circuit has found that determining whether the enhancement applies requires the district court to look at "evidence beyond the facts underlying the offense conduct" and to show that the defendant intended for his material support to be used to "influence

or affect the conduct of government by intimidation or coercion." United States v. Kurashev, No. 24-2874, 2026 WL 1746968 (9th Cir. June 17, 2026) (unpublished). That "intent may be inferred from evidence regarding the defendant's knowledge of how the support will be used." Id.

At sentencing the requisite intent must be proven by a preponderance of the evidence. See United States v. Lucas, 101 F.4th 1158, 1163 (9th Cir. 2024) (preponderance of the evidence standard applies to factual findings under the guidelines).

Here, overwhelming evidence supports the application of the terrorism enhancement. Defendant's admissions in his plea agreement, as well as his post-arrest interview, and evidence from his digital devices show that his support to ISIS was given with the intent of influencing or affecting the conduct of government by intimidation or coercion.

First, defendant admitted in both his plea agreement and in his post-arrest interview to sending money to the ISIS fighter, who he described in his custodial interview as a "Field Commander," with the understanding that the ISIS Fighter would be purchasing guns and ammunition with the funds in order for ISIS to conduct operations in its fight against the governments of Syria and the United States. The defendant provided this money with the intent that the ISIS fighter and others would be positioned to purchase guns and ammunition to further conduction their "operations" or the "holy war" in Syria. Given the well established objective of ISIS in that region to overthrow the Syrian government and establish a caliphate,

the evidence shows that defendant's actions were done with the intent to influence or affect government conduct.

Second, defendant knew that the ISIS Fighter was in ISIS because (1) the ISIS Fighter told him he was a "field commander," (2) the ISIS Fighter sent videos of his recent operations in Syria, and (3) the ISIS Fighter exchanged propaganda videos and other pro-ISIS content with the defendant. Some of the propaganda, described in detail above, discusses ISIS's goal of establishing a worldwide caliphate – a goal which necessarily involves influencing the conduct of another government and, in the context of the statements above, would be accomplished using intimidation and coercion.

Third, defendant's planning of a homegrown terrorist operation in the United States at the behest of ISIS also satisfies the enhancement. The desire to engage in jihad or martyrdom at the direction of ISIS is an overt tactic employed by ISIS to effectuate its objectives of influencing and intimidating the organizations enemies, specifically the United States.

The evidence establishes that defendant's actions were driven by an intent "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). Accordingly, the Court should adopt Probation's findings and apply the enhancement.

## V. GOVERNMENT'S RECOMMENDATION

### 1. Nature and Circumstances of the Offense

The Court must consider the nature, circumstances, and seriousness of the offense. 18 U.S.C. § 3553(a)(1), (a)(2)(A). Here, the seriousness of the defendant's crimes are reflected in the government's sentencing recommendation. The defendant's choices and

actions in this case placed himself and others in grave danger and furthered an ideology that is only satiated by violence and death.

The defendant's actions were calculated to ensure that he was supporting ISIS. Defendant provided over $1,600 to ISIS, a group bent on the overthrow of secular governments and the downfall of Western civilization. Defendant sent the money with the explicit intention that it would be used to purchase weapons and ammunition for ISIS fighters to engage in jihad. And defendant was aware of ISIS's brutal violence through the numerous propaganda videos he exchanged with the ISIS Fighter and by admitting to law enforcement that he was aware that ISIS killed innocent people in its quest to establish a caliphate.

Further enhancing the egregiousness of the defendant's actions, the defendant also took substantial steps to carry out a terrorism operation here in the United States. Defendant glorified martyrdom, wanting to cause "mass damage," and discussed his need for better weapons with the ISIS Fighter in order to carry out a violent attack. Law enforcement was only able to recover fragments of the chat messages between the defendant and the ISIS Fighter, but what was recovered was chilling. In support of defendant's goal to cause mass damage in the name of ISIS here in the United States, defendant built an IED that was discovered while law enforcement executed a search warrant on his residence. The presence of a homemade explosive device - stuffed with ball bearings and screws meant to create maximum carnage - underscores how dangerous the defendant is. This device was unsecured in a home shared with others, including children. If not for the quick action of law enforcement, the defendant likely would have put his desire to cause "mass damage" to

horrific effect.

2. Personal Characteristics and Criminal History of the Defendant

Unfortunately, this is not the first time the defendant has broken the law. The defendant was previously convicted of felony stalking arising from an incident in Los Angeles County. According to the PSR, even after his initial arrest on that stalking charge, defendant continued to message and harass the victim in that case. In those messages, the defendant "indicated that he was bailed out and that he was angry and she was in danger" and he explicitly threatened to "kill her." (PSR at 39.) This too is incredibly serious conduct that bears on the appropriate sentence here.

Defendant also clearly suffers from psychiatric issues but as indicated in the PSR, he was under treatment and medicated when he committed the current offense. (PSR at 53.) This shows that even while medicated, defendant poses a danger to society that can only be addressed by a significant period of incarceration. Additionally, as a core condition of the defendant's supervision, the Court should adopt Probation's recommendation and require the defendant to undergo a mental health evaluation and follow recommended treatment. See U.S.S.G. § 5D1.1, comment. (n.5). Defendant's ongoing mental health struggles, in combination with the serious nature and circumstances of this case, justify both a significant custodial sentence, to ensure that he cannot harm others, and a lifetime period of supervised release.

Considering all these factors, the government agrees with USPO that a total custodial sentence of 360 months in custody is appropriate.

//

3. Need for Deterrence and to Promote Respect for the Law

The recommended sentence is necessary not only to deter defendant, but also to adequately deter others. See 18 U.S.C. § 3553(a)(2)(B) (the sentence imposed is required "to afford adequate deterrence to criminal conduct," which encompasses both specific and general deterrence). A significant term of imprisonment is warranted here to convey the seriousness of the offense and to further general deterrence.

4. Supervised Release

A life-time period of supervised release would provide an added measure of deterrence and protection that is warranted under the facts of this case. Supervision would allow the Court to ensure that defendant does not revert to crime upon his release from custody and given the repeated, and escalating nature, of his criminal history a life term is essential to protect the community.

5. Fine

The PSR indicates that the defendant is unable to pay a fine. (PSR ¶ 62). Absent additional information the government concurs with this recommendation.

**VI. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose (1) a 360-month term of imprisonment, to be comprised of 240 months on Count 1 and 120 months on Count 3 to be run consecutively; (2) a life-time period of supervised release; and (3) a special assessment of $200.